**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DAN CHERNER, on his own behalf and on behalf of
all others similarly situated,

        Plaintiff,

v.

WESTCHESTER JEWISH COMMUNITY
SERVICES, INC., and KATHLEEN MCKAY,

        Defendants.

20 CIV 8331 (CS)(JCM)

FIRST AMENDED COMPLAINT

JURY DEMAND

## FIRST AMENDED COMPLAINT

1.     Plaintiff, Dan Cherner, brings this action pursuant to 42 U.S.C. §1983 and the United States Constitution, including the 1st, 5th, and 14th Amendments, as well as the Declaration of Independence, and under New York State law, pursuant to 28 U.S.C. § 1367. Plaintiff contends that defendants willfully, knowingly, deliberately and negligently violated his Constitutional and legal rights as follows.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Plaintiff's state law claims are brought pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and (b)(2), as the defendants reside in this judicial district and the acts complained of herein took place in this judicial district.

## PARTIES

4.      Plaintiff Dan Cherner is a citizen of the United States and resident of the State of New York.

5.      Defendant Westchester Jewish Community Services, Inc. (WJCS) is a corporation organized under the laws of the State of New York, with offices located in White Plains, New York; Hartsdale, New York; and Yonkers, New York.

6.      Defendant Kathleen McKay is, upon information and belief, an employee of defendant WJCS.  Upon information and belief, defendant McKay was and is a licensed psychologist in the State of New York and a member of the American Psychological Association (APA).

7.      At all times complained of herein, defendants were state actors, in that they were clothed with the authority of state law, and their actions were taken under color of state law.

8.      At all times complained of herein, the Family Court of the State of New York completely relied on defendants with respect to forensic evaluation, and insinuated itself into a position of interdependence with the defendants so as to make itself a joint participant in defendants' actions.

9.      At all times complained of herein, the State of New York, Family Court of the State of New York, created the legal framework through which defendants acted and which was to govern the defendants' conduct.

10.     At all times complained of herein, the Family Court of the State of New York delegated its responsibilities and its authority with respect to forensic evaluation to defendants, and defendants' Constitutional and legal violations occurred while exercising that authority.

11.     At all times complained of herein, defendants' conduct violated clearly established Constitutional and statutory rights of which a reasonable person would have known.

## STATEMENT OF FACTS

12.     On or around May 6, 2016, Mr. Cherner filed for custody of his children in New York State Family Court.

13.     On August 30, 2016, Mr. Cherner filed an amended custody petition which detailed more facts, including:  (i) on May 8, 2016, the adverse party in the custody petition (Ospina) tried to grab Mr. Cherner's children and force herself on them physically; when they responded affirmatively to her question as to whether they wanted to reside with Mr. Cherner full-time, she told them to leave; (ii) on May 30, 2016, Mr. Cherner's children were scheduled to study for their final examinations, yet Ospina forced them into a vehicle on threat of physical violence and prevented them from studying; (iii) on June 6, 2016, Ospina forced Mr. Cherner's children to sit with her and she began reading from Mr. Cherner's custody petition and asking them questions about it; (iv) on June 25, 2016, as Mr. Cherner and one of his children were walking to a high school graduation ceremony, where the other child was performing, Ospina stalked them in her car, tried to confront Mr. Cherner's child, and, when Mr. Cherner told her to stop, she stated "I don't have to speak with you", and then started yelling "I am a woman, I am a woman" as she drove away; (v) on July 8, 2016, Mr. Cherner's children were each spending the day with friends, with Ospina's knowledge, yet she threatened them and tracked them down, and forced them to go with her, and then proceeded to lock them in separate rooms for the remainder of the day.

14.     In fact, in 2013, Mr. Cherner had filed a petition for an order of protection on behalf of his children and against Ospina, in Family Court in 2013, based on repeated threats of physical violence made by Ospina to Mr. Cherner's children.

15.     On September 29, 2016, defendants WJCS and McKay were appointed as the forensic evaluator in the custody matter.

16.     The "Order for Forensic Evaluation" ordered that the forensic evaluator "conduct a complete forensic evaluation" of Mr. Cherner, his children, and Ospina, including "evaluations of each parent, the children and each parent with the children."

17.     Defendants were and aware, or should have been aware, that evaluating children with each parent is essential  to a forensic evaluation, as case law makes clear that a forensic evaluation and report have no evidentiary value and are not taken into consideration if there is no evaluation of the children with each parent.

18.     The order also ordered that "the forensic evaluator shall conduct the necessary interviews and investigations, and thereafter shall submit to the court a report **within 60 days from the date of this Order** unless the court, upon application, shall provide otherwise. (emphasis in original).

19.     On October 31, 2016, by court order, Mr. Cherner was granted temporary primary physical custody of his children.

20.     Upon information and belief, the court amended the original forensic evaluation order so as to require Mr. Cherner and the other party to pay defendants, i.e., "private pay" as opposed to payment being made by New York State.  Upon information and belief, defendants and defendant McKay refused to begin work until the order was so modified, which was done, upon information and belief, in December 2016.

4

21.     The original order required defendants and defendant McKay to submit a report to the court no later than November 23, 2016; however, defendants did not even begin work in this regard until January 2017. Even if defendants had 60 days from the date of a modified order, they would have been required to submit a report to the court no later than, upon information and belief, the end of February, 2017.

22.     In fact, defendants constantly and deliberately delayed their work, and delayed issuance of a report to the court. At no time did defendants ever make any application to the court for an extension of time to submit a report to the court.

23.     Meanwhile, Ospina had yet another outburst when, on November 26, 2016, she threatened Mr. Cherner's children and put them in fear of their physical safety as they were leaving a visitation with her. Ospina's behavior was so extreme that Mr. Cherner had to call the police and have them appear so as to ensure his children's safety.

24.     When Mr. Cherner first met with defendant McKay on January 23, 2017, he explained to her that her work and report were delayed, and explained that there was a court date in April, 2017. McKay stated clearly that she could get her work done and issue a report in advance of that court date, but immediately stated that she would not issue a report until she got paid.

25.     Mr. Cherner and the other party were ordered to pay defendant McKay $7,500.00 each – in other words, the court decided that this was a "private pay" matter as opposed to the court system paying for the evaluation. Defendant McKay expressed to Mr. Cherner her further willingness to violate the court's order by stating that she would not issue her report until she was paid.

5

26.  Nowhere in the court order is there any provision for defendants' report to the court being contingent on being paid.

27.  Defendant McKay also told Mr. Cherner on January 23, 2017, that her work would include observing Mr. Cherner's children with each parent, as required by the court order. Despite this acknowledgement of the court's order and material representation to Mr. Cherner, defendants and defendant McKay deliberately failed and refused to comply with the court order in this regard. Defendant McKay also promised to Mr. Cherner that she would obtain the other party's therapist's records, as required by court order.

28.  Mr. Cherner made defendant McKay aware of the incidents mentioned his amended petition, as well as the incident in November, 2016, as well as the incidents surrounding the 2013 petition, as well as many other incidents by the other party where she threatened Mr. Cherner's children with physical violence, encroached on their physical space, engaged in intimidation and intimidation tactics, disparaged him to them on a regular basis, and, in general, engaged and attempted to engage in a reign of terror.

29.  Mr. Cherner made it clear to defendant McKay that the other party's actions were part of an ongoing and deliberate pattern of behavior designed to harm his children.

30.  Mr. Cherner also informed defendant McKay of several financial crimes that the other party had committed over an extended period of time, which he had discovered during the course of a prior matrimonial action.

31.  Mr. Cherner also informed defendant McKay that the other party had told him that she had been in therapy, and that she had told him that she had been diagnosed with some type of disorder.

32.     Over time, defendant McKay made it clear that she was not interested in such information, but, rather, she was interested in trying to demonize Mr. Cherner and cast him in a bad light, based, in part, on her discriminatory animus towards Mr. Cherner based on gender.

33.     Thus, defendant McKay asked Mr. Cherner principally about his past, going back decades, and sought to ridicule him. Such queries had little, if any, relevance to defendants' task.

34.     Defendant McKay asked little or nothing about his parenting of his children, his view of the parenting – and lack thereof – of the other party, and other relevant lines of inquiry which were pertinent to her task and the order of the court.

35.     To Mr. Cherner's knowledge, defendants never sought to obtain and never did obtain the records of the therapist seen by the other party, records which, upon information and belief, would have had major relevance to defendant McKay's appointed task.

36.     After Mr. Cherner's first meeting with defendant McKay, her behavior became more and more inappropriate.

37.     Mr. Cherner met with defendant McKay three times, the last time being February 7, 2017. On that date, defendant McKay stated told Mr. Cherner that the next meeting would be with him and his children, and that she would reach out to him to schedule. She explained that she still had another meeting with the other party, and that she would then schedule meetings with each party and the children.

38.     There was never any further attempt by defendant McKay to schedule a meeting with Mr. Cherner and his children.

39.     Instead, defendant McKay conspired with the other party to demonize Mr. Cherner and put his children at risk.

40.     As part of this conspiracy, defendants and defendant McKay deliberately and intentionally decided not to follow the court's order, not to observe the children with each parent, not to issue an impartial and objective report, and, instead, to infringe on Mr. Cherner's Constitutional and legal rights and violate them.

41.     Defendant McKay also decided to commit multiple violations of the American Psychological Association's (APA) Code of Ethics.  As a member of the APA, defendant McKay is bound to follow these ethical requirements.

42.     Instead of scheduling meetings with each parent and the children, as required by the court's order, defendant McKay decided, with the other party, to appear at the other party's residence and question Mr. Cherner's children, without prior notification to Mr. Cherner's childrens' attorney (law guardian), and without seeking any consent from the law guardian to engage in such activity.

43.     Thus, on April 4, 2017, Mr. Cherner's youngest child was studying for an exam at a friend's residence after school, with the knowledge of Mr. Cherner and the other party.

44.     The other party contacted Mr. Cherner's child at 3:55 p.m., and told her that she was going to pick her up at 5:00 p.m. (for her scheduled visitation); Mr. Cherner's child told her she would not yet be done studying.

45.     The other party started yelling at Mr. Cherner's child, telling her that does not get to decide what she is going to do, and that she was going to pick her up at 5:00 p.m., and then hung up the phone.

46.     The temporary order of custody made it clear that the other party could not interfere with the extracurricular activities of Mr. Cherner's children; this restriction included after-school studying.

8

47.     The reason for this outburst soon became clear.  When Mr. Cherner's oldest child arrived at the other party's residence around 5:00 p.m., defendant McKay was present, introduced herself, and proceeded to ask her some questions.

48.     In other words, defendant McKay conspired with the other party to appear unannounced, without notice to the law guardian, and inappropriately question Mr. Cherner's children.

49.     Such inappropriate behavior by defendant McKay, in which she appeared unannounced, without notice to the law guardian, was a clear indication that defendant McKay had decided to inappropriately align herself with the other party, and clearly intended to violate Mr. Cherner's Constitutional and legal rights.

50.     Defendants and defendant McKay's inappropriate behavior continued.  Defendant McKay scheduled meetings with the other party to meet with Mr. Cherner's children without consulting the law guardian, as would have been appropriate.  Such meetings were scheduled for April 20, 2017 and May 9, 2017, even though such dates interfered with Mr. Cherner's childrens' extracurricular activities – in context, the Family Court judge had made it explicitly clear that such meetings were to be scheduled so as not to interfere with such extracurricular activities.

51.     When the law guardian got involved to schedule dates, dates were scheduled without interfering with extracurricular activities; however, when defendant McKay met with Mr. Cherner's children, she met with each of them separately, outside the presence of the other party and any other individuals.

52.     Defendant McKay never told Mr. Cherner that she wanted to or planned to meet with his children separately.  Defendant McKay never reached out to Mr. Cherner to ask him or seek to have him bring his children for a meeting with her.

53.     Instead, defendant McKay conspired with the other party to seek to find some way to violate Mr. Cherner's Constitutional and legal rights and to issue a report demonizing him and minimizing the other party's continual and ongoing abuse and threats of violence.

54.     Thus, when defendant McKay's inappropriate behavior on April 4, 2017, was brought to light, she inappropriately sought to characterize it is a "home inspection" and claimed to Mr. Cherner that she wanted to do a "home inspection."  Defendant McKay never followed up on this supposed intention.

55.     On June 9, 2017, Mr. Cherner sought to understand these behaviors from defendant McKay and to understand what else needed to be done to complete her assignment.

56.     In response, defendant McKay falsely claimed that she had sent Mr. Cherner an email requesting his assistance in facilitating appointments with the other party and his children, and that when he did not respond, she "assumed" that he was "no longer going to comply."

57.     Such outrageous and false claims exist as further proof of defendants and defendant McKay's intentional alignment with the other party and her deliberate intent to violate Mr. Cherner's Constitutional and legal rights.

58.     In that response, defendant McKay also informed Mr. Cherner that she had to meet with the other party another one or two times, she was most likely done meeting with his children, and would like to meet with him again.

59.     Mr. Cherner informed defendant McKay that it is always improper to assume, and that she could have easily reached out to him and communicated directly.  He also informed

defendant McKay of his availability, and she stated that she would get back to him to schedule a meeting. Defendant McKay never got back to Mr. Cherner nor did she ever seek to schedule a meeting with Mr. Cherner and his children.

60.    Instead, Mr. Cherner reached out to defendant McKay on September 22, 2017 and let her know of his availability to meet. Defendant McKay responded by stating that it did not appear to her that she needed to meet, but would let him know the following week. Defendant McKay never reached out to Mr. Cherner beyond that date.

61.    Instead, defendant McKay continued her ongoing conspiracy and alignment with the other party to demonize Mr. Cherner and violate his Constitutional and legal rights.

62.    Defendant McKay also deliberately delayed the issuance of her report to try and create a situation where Mr. Cherner, and, most importantly, Mr. Cherner's expert witness and attorney, had very little time to review the report and properly prepare and refute it at the custody hearing.

63.    Thus, for a hearing scheduled on November 6, 2017, defendants and defendant McKay issued a report dated October 6, 2017, knowing that (i) the report goes to the court, (ii) Mr. Cherner's attorney and expert witness have to go to the court and get a copy of it and then review it.

64.    Defendants and defendant McKay issued a report that was outlandish and inappropriate, and of no evidentiary value. Defendant McKay violated the court's order by deliberately refusing to meet with the children and each parent, because she knew that such meetings would obligate her to speak to the ongoing and continuous violence and threats of violence and wrongful acts of the other party.

11

65.     Defendant McKay also failed and refused to obtain the therapist's records, which, upon information and belief, would have given valuable and relevant evidence. The other party and her attorney spent the entirety of the proceeding trying to prevent Mr. Cherner from obtaining such records, to which he was entitled. Upon information and belief, defendant McKay conspired with these individuals from keeping such records from being obtained.

66.     Instead, defendant McKay improperly included hearsay in her report and outlandish and outrageous conclusion.

67.     Thus, defendants and defendant McKay sought to demonize Mr. Cherner by including in the report hearsay allegations about him which were and are patently false and defamatory. Defendant McKay never mentioned this hearsay to Mr. Cherner and sought his response. Further, based on information provided by Mr. Cherner to defendant McKay, she knew or should have known such allegations were false.

68.     Incredibly, defendant McKay, in her report, sought to minimize the ongoing and continuous outbursts and threats of violence against the other party, by falsely claiming that the other party's behavior was the fault of Mr. Cherner's children, for not being "empathic" enough to understand the "triggers" that cause the other party to engage in such outbursts and threats.

69.     The entire report was an attempt to demonize Mr. Cherner and to minimize the other party's behavior, and an attempt to violate Mr. Cherner's Constitutional and legal rights and to harm him and his children.

70.     Mr. Cherner's expert found the report to be as much. Specifically, he found that defendant McKay's "report does not comport with APA Guidelines for Forensic Psychology", and that defendant McKay's report did not address the issue of confirmation bias, in which the evaluator ends up "utilizing data non-scientifically and opining based on speculation as opposed

to supporting analyses with a scientific foundation derived from empirical literature", and that "there was little if any effort to address the issue of confirmatory bias. The report was essentially one-sided."

71. Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report violated APA Guideline 2.05, "Knowledge of the Scientific Foundation for Opinions and Testimony", in that defendant McKay "does not provide a single source or reference to support her conclusory statements or how her methodology supports her conclusions . . . this responsibility was not undertaken through the entirety of the report, which has resulted in speculative and unsupported conclusions."

72. Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report violated APA Guideline 9.02, "Use of Multiple Sources of Information", in that defendant McKay used multiple sources of information "in a perfunctory way and makes no attempt to apply caveats as to the strengths and limitations of her findings . . . [defendant] McKay does not do an adequate job of identifying potential problems associated with relying on self-report and as a result is overconfident in the generation of her conclusions."

73. Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report violated APA Guideline 10.02, "Selection and Use of Assessment Procedures", in that defendant McKay "did not conduce an interview with father and children and did not conduct an interview with mother and children either. [Defendant] McKay was directed by Court order to conduct such interviews and she failed to do so. Such interviews and observations of each parent with the children are essential in a custody evaluation. As a result, the most important and substantial data in the study was not collected."

74.     Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report violated APA Guideline 11.02, "Differentiating Observations, Inferences, and Conclusions", in that defendant McKay "does not distinguish between what she observes and speculates about with any unified theory which could be cross-referenced to the science of her methods or the underlying foundation supporting her conclusions.  The vast majority of her conclusions were "inferential", without any unified theory of what supports them."

75.     Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report did not comport with APA Guidelines for custody evaluation, and violated Section I ("Orienting Guidelines:  Purpose of the Child Custody Evaluation Subsection 3:  The evaluation focuses upon parenting attributes, the child's psychological needs, and the resulting fit"), in that defendant McKay specifically criticized Mr. Cherner personally but "does not spend any significant effort explaining how his parenting attributes fit the needs of his children at the present time and at the children's current state of need."

76.     Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report did not comport with Section I Subsection 5 ("Impartial Evaluators") in that defendant McKay "spends little if any effort describing the complexities of the family dynamic, nor does she delve into the contributions each family makes to the current circumstances.  Instead, effort was taken to highlight father's weaknesses and ignore his potential strengths; and also to ignore the mother's weaknesses and minimize them."

77.     Specifically, Mr. Cherner's expert found that defendants and defendant McKay's report did not comport with Section 12 ("Psychologists strive to complement the evaluation with the appropriate combination of examinations"), in that defendant McKay  "failed to interview/observe the father with the children and also failed to interview/observe the mother

14

with the children.  Without such an interview the evaluator is at a serious disadvantage in providing underlying support for the criticism she levels at Mr. Cherner in the conclusory section of her report and for her minimalization of the mother's issues.  Further, such interviews/observations are essential to this type of forensic examination/custody evaluation."

78.     Mr. Cherner did not start to learn of the contents of the report until October 13, 2017.

79.     It is clear from McKay's failures and refusals to follow the court's order; from her numerous ethics violations; and from her outlandish and inappropriate report; that she was attempting to run a racket, in which she improperly aligned herself with the other party, ignored and minimized the unacceptable and inappropriate behaviors of the other party, and tried to demonize Mr. Cherner, to create a situation in which she could entrap Mr. Cherner's children and deceive the court into ordering therapy, from which she and defendant WJCS would profit and benefit from financially.

80.     Defendants and defendant McKay took such actions in violation of Mr. Cherner' s Constitutional and legal rights.

81.     Upon information and belief, defendants and defendant McKay have done this in other matters and continue to engage in such illegal and unacceptable behavior.

82.     On November 6, 2017, the Family Court issued a final order giving Mr. Cherner primary physical custody of his children.

### Defendants were state actors

83.     Both of the defendants were named in the Court's order, and both are state actors, as (i) New York State created the legal framework governing the defendants' conduct – they are

directed specifically as to what their assignment is, within the body of the order; and (ii) New York state delegated its authority to conduct a forensic analysis to the defendants.

84.     The defendants were able to so act only because they were clothed with authority under state law, so their actions were actions taken "under color of" state law.

### Defendants are not entitled to absolute immunity

85.     While individuals and/or entities may be entitled to absolute immunity in performing judicial functions that have been delegated to them, such individuals and/or entities are not entitled to absolute immunity when they act outside the scope of their authority.

86.     In this matter, the defendants acted outside the scope of their authority, in that they refused and failed to carry out the directives as given in the court order, and, thus, are not entitled to absolute immunity.

87.     Defendants acted outside the scope of the authority granted to them, and, as a result, they are not entitled to absolute immunity.

88.     Just as a prosecutor, for example, loses his or her immunity when directing an arrest, for example, which is outside the scope of prosecutorial authority, defendants lose any absolute immunity that they might have when they act, as in this matter, outside of the scope of their authority.

89.     To allow otherwise would not only stand the law on its head, but lead to a result where a forensic examiner could blatantly (as in this matter) violate a court order, act outside the scope of his/her/its authority, in a manner intended to abuse and prey on vulnerable children, and not be held accountable in this regard.

**Defendants are not entitled to qualified immunity**

90. Defendants are not entitled to qualified immunity either. The causes of action herein involve clearly established statutory and Constitutional rights of which a reasonable person would have known.

**Defendants are not entitled to XIth Amendment immunity**

91. Defendants are state actors, not a State and not a state official or employee, and, accordingly, defendants are not entitled to XIth Amendment immunity.

## CLASS ALLEGATIONS

92. Upon information and belief, defendants and defendant McKay routinely receive court appointments to act as a forensic evaluator custody cases.

93. Upon information and belief, defendants and defendant McKay routinely aligns herself, inappropriately and illegally, with one party in a custody matter.

94. Upon information and belief, defendants and defendant McKay routinely and deliberately refuse to comply with court orders, including refusing and failing to meet with children and each parent together.

95. Upon information and belief, defendants and defendant McKay routinely violate the Constitutional and legal rights of litigants in custody cases, and attempt to cause harm to litigants and children in so doing.

96. There are questions of law or fact which are common to such class.

97. The claims of plaintiff are typical of the claims of the class.

98. Plaintiff will fairly and adequately protect the interests of the class.

## AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983: 1st and 14th Amendments Liberty Interest in Retaining Custody

99.     Plaintiff repeats and realleges paragraphs 1 through 98 above as though set forth herein.

100.    Prior to defendants' involvement, Mr. Cherner was granted temporary full custody.

101.    Mr. Cherner had a liberty interest in retaining custody of his children.

102.    Defendants violated that liberty interest, in violation of the 1st and 14th amendments to the U.S. Constitution and other laws.

103.    In this regard, defendants discriminated against Mr. Cherner based on gender.

104.    For example, defendants ignored and/or minimized the other party's (i) mental health records, (ii) numerous outbursts and threats of violence; (iii) the Family Court petition filed against her in 2013; (iv) numerous police reports detailing her behavior, etc.

105.    Defendants also gave the other party opportunity to present individuals (whose hearsay testimony wound up in their report) and did not afford the same to Mr. Cherner.

106.    Defendants also coordinated with the other party to "show up" one afternoon without Mr. Cherner's knowledge and without the knowledge or consent or presence of the children's attorney.

107.    Defendants interfered with and violated Mr. Cherner's rights by refusing to comply with the court's order as noted above, and, specifically, by refusing and failing to observe Mr. Cherner's children with each parent and by deliberately delaying completion of their assignment in violation of the court's order, and by acting inappropriate also as noted above.

108.    Such delay and refusal interfered with Mr. Cherner's liberty interest in retaining custody of his children in violation of the 1st and 14th Amendments to the U.S. Constitution.

109.   Plaintiff is entitled to damages pursuant to 42 U.S.C. § 1983.

## AS AND FOR A SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983: 1st and 14th Amendments Right to Personal Privacy and Family Relationships

110.   Plaintiff repeats and realleges paragraphs 1 through 109 above as though set forth herein.

111.   At all times herein, Mr. Cherner had and has a right to personal privacy and family relationships, protected by the 1st and 14th Amendment to the U.S. Constitution and other laws.

112.   Defendants violated these rights by refusing to observe the children with each parent, as required by the court order; by failing and refusing to conduct the assigned work in a timely manner and to issue a report within the time frame required by the Family Court; by failing and refusing to obtain the other party's therapist's records; and by aligning themselves with the other party inappropriately, and seeking to inappropriately demonize Mr. Cherner and inappropriately interfere with his rights.

113.   In this regard, defendants discriminated against Mr. Cherner based on gender.

114.   For example, defendants ignored and/or minimized the other party's (i) mental health records, (ii) numerous outbursts and threats of violence; (iii) the Family Court petition filed against her in 2013; (iv) numerous police reports detailing her behavior, etc.

115.   Defendants also gave the other party opportunity to present individuals (whose hearsay testimony wound up in their report) and did not afford the same to Mr. Cherner.

116.   Defendants also coordinated with the other party to "show up" one afternoon without Mr. Cherner's knowledge and without the knowledge or consent or presence of the children's attorney.

117.    Such wrongful acts were in violation of Mr. Cherner's rights as noted above.

118.    Plaintiff is entitled to damages pursuant to 42 U.S.C. § 1983.

### AS AND FOR A THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983:  1st and 14th Amendment violations of Mr. Cherner's liberty interest in preserving the integrity and stability of his family from intervention without due process of law

119.    Plaintiff repeats and realleges paragraphs 1 through 118 above as though set forth herein.

120.    At all times herein, Mr. Cherner had and has a liberty interest in preserving the integrity and stability of his family from intervention without due process of law, protected by the 1st and 14th Amendment to the U.S. Constitution and other laws

121.    Defendants violated these rights by refusing to observe the children with each parent, as required by the court order; by failing and refusing to conduct the assigned work in a timely manner and to issue a report within the time frame required by the Family Court; by failing and refusing to obtain the other party's therapist's records; and by aligning themselves with the other party inappropriately, and seeking to inappropriately demonize Mr. Cherner and inappropriately interfere with his rights.

122.    In this regard, defendants discriminated against Mr. Cherner based on gender.

123.    For example, defendants ignored and/or minimized the other party's (i) mental health records, (ii) numerous outbursts and threats of violence; (iii) the Family Court petition filed against her in 2013; (iv) numerous police reports detailing her behavior, etc.

124.    Defendants also gave the other party opportunity to present individuals (whose hearsay testimony wound up in their report) and did not afford the same to Mr. Cherner.

125.    Defendants also coordinated with the other party to "show up" one afternoon without Mr. Cherner's knowledge and without the knowledge or consent or presence of the children's attorney.

126.    Such wrongful acts were in violation of Mr. Cherner's rights as noted above.

127.    Plaintiff is entitled to damages pursuant to 42 U.S.C. § 1983.

### AS AND FOR A FOURTH CAUSE OF ACTION
### 1st and 14th amendment violations of Mr. .Cherner's right to raise his children free from state interference absent some compelling justification for interference

128.    Plaintiff repeats and realleges paragraphs 1 through 127 above as though set forth herein.

129.    At all times herein, Mr. Cherner had and has a right to raise his children free from state interference absent  some compelling justification for interference, protected by the 1st and 14th Amendment to the U.S. Constitution and other laws.

130.    Defendants violated these rights by refusing to observe the children with each parent, as required by the court order; by failing and refusing to conduct the assigned work in a timely manner and to issue a report within the time frame required by the Family Court; by failing and refusing to obtain the other party's therapist's records; and by aligning themselves with the other party inappropriately, and seeking to inappropriately demonize Mr. Cherner and inappropriately interfere with his rights.

131.    In this regard, defendants discriminated against Mr. Cherner based on gender.

132.    For example, defendants ignored and/or minimized the other party's (i) mental health records, (ii) numerous outbursts and threats of violence; (iii) the Family Court petition filed against her in 2013; (iv) numerous police reports detailing her behavior, etc.

133.   Defendants also gave the other party opportunity to present individuals (whose hearsay testimony wound up in their report) and did not afford the same to Mr. Cherner.

134.   Defendants also coordinated with the other party to "show up" one afternoon without Mr. Cherner's knowledge and without the knowledge or consent or presence of the children's attorney.

135.   Such wrongful acts were in violation of Mr. Cherner's rights as noted above.

136.   Plaintiff is entitled to damages pursuant to 42 U.S.C. § 1983.

## AS AND FOR A FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983:  1st and 14th Amendment violations of Mr. Cherner's liberty interest in the care,  custody, and management of his children

137.   Plaintiff repeats and realleges paragraphs 1 through 136 above as though set forth herein.

138.   At all times herein, Mr. Cherner had and has a liberty interest in the care, custody, and management of his children, protected by the 1st and 14th Amendment to the U.S. Constitution and other laws.

139.   Defendants violated these rights by refusing to observe the children with each parent, as required by the court order; by failing and refusing to conduct the assigned work in a timely manner and to issue a report within the time frame required by the Family Court; by failing and refusing to obtain the other party's therapist's records; and by aligning themselves with the other party inappropriately, and seeking to inappropriately demonize Mr. Cherner and inappropriately interfere with his rights.

140.   In this regard, defendants discriminated against Mr. Cherner based on gender.

141.   For example, defendants ignored and/or minimized the other party's (i) mental health records, (ii) numerous outbursts and threats of violence; (iii) the Family Court petition filed against her in 2013; (iv) numerous police reports detailing her behavior, etc.

142.   Defendants also gave the other party opportunity to present individuals (whose hearsay testimony wound up in their report) and did not afford the same to Mr. Cherner.

143.   Defendants also coordinated with the other party to "show up" one afternoon without Mr. Cherner's knowledge and without the knowledge or consent or presence of the children's attorney.

144.   Such wrongful acts were in violation of Mr. Cherner's rights as noted above.

145.   Plaintiff is entitled to damages pursuant to 42 U.S.C. § 1983.

## AS AND FOR A SIXTH CAUSE OF ACTION
## FRAUD

146.   Plaintiff repeats and realleges paragraphs 1 through 145 above as though set forth herein.

147.   On January 23, 2017, defendant McKay told Mr. Cherner (i) that her work would include observing his children with each parent, as required by court order; (ii) that she would get the work done and a report to the court in advance of the April, 2017 court date; and (iii) that she would comply with all aspects of the court order.

148.   These statements were both material and false.  Further, defendant McKay never intended to observe Mr. Cherner's children with each parent, nor did she intend to issue a report in a timely manner, both as required by court order, nor did she intend to comply with other aspects of the court order.  Defendant McKay intended to deceive Mr. Cherner.

149.   Mr. Cherner relied on these representations and statements by defendant McKay, and such reliance was reasonable.

150.   Defendants are not entitled to any type of immunity under state law, as they manipulated the legal process, and they acted in bad faith and without a reasonable basis.

151.   Mr. Cherner suffered injuries as a result of defendants' fraud, including but not limited to:  interference with his Constitutional rights as noted above; additional attorney's fees and expenses incurred; emotional distress; and physical distress due to emotional distress.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

152.   Plaintiff repeats and realleges paragraphs 1 through 151 above as though set forth herein.

153.   On January 23, 2017, defendant McKay told Mr. Cherner (i) that her work would include observing his children with each parent, as required by court order; (ii) that she would get the work done and a report to the court in advance of the April, 2017 court date; and (iii) that she would comply with all aspects of the court order.

154.   These statements were both material and false.  Further, defendant McKay never intended to observe Mr. Cherner's children with each parent, nor did she intend to issue a report in a timely manner, both as required by court order, nor did she intend to comply with other aspects of the court order.  Defendant McKay intended to deceive Mr. Cherner.

155.   Mr. Cherner relied on these representations and statements by defendant McKay, and such reliance was reasonable.

156.   Further, defendants failed and refused to observe Mr. Cherner's children with each parent as required by court order; failed and refused to issue a report in a timely manner as required by court order; failed and refused to seek and obtain the therapist's records of the other party, as required by court order; included hearsay (which was false) provided by individuals at the other party's behest, but failed to afford to Mr. Cherner the opportunity to provide witnesses

24

to substantiate the information provided by him; failed to obtain the other party's therapist's records; sought to demonize Mr. Cherner; and violated several APA ethical guidelines.

157.   Defendant McKay had a duty to comply and carry out the court's order, and to act and conduct herself within the ethical guidelines of the APA; her failure to do so was intentional and deliberate, reckless, and negligent.

158.   As a direct result of defendant McKay's improper conduct in this regard, Mr. Cherner suffered emotional distress, and also physical distress caused by emotional distress.

159.   Defendants are not entitled to any immunity under state law, as they acted in bad faith, manipulated the legal process, acted without a reasonable basis.

160.   Mr. Cherner is entitled to damages as a result of defendants' negligent infliction of emotional distress.

## **PRAYER FOR RELIEF**

161.   Plaintiff requests the following relief:

(a) On the First through Seventh causes of action, actual damages as permitted by law, including for the proposed class, in excess of $75,000;

(b) An injunction enjoining defendant McKay and anyone acting on behalf of or working for defendant WJCS and/or defendant McKay from accepting any assignments from any court to act as a forensic evaluator, pending the resolution of this matter;

(c) An injunction enjoining defendant McKay and anyone acting on behalf of or working for defendant WJCS and/or defendant McKay from working on any current assignments from any court to act as a forensic evaluator, pending the resolution of this matter;

(d) Appointment of a monitor to oversee and report to the Court on a periodic basis, the status of any current forensic evaluator assignments made to defendant WJCS or defendant McKay or anyone working for or on behalf of defendant WJCS;

(e) An order prohibiting defendants and anyone acting on their behalf from violating any and all court orders with respect to forensic evaluator assignments;

(e) Attorney's fees and costs as to which plaintiff may be entitled;

(f) An order certifying the proposed class and designating plaintiff as representative of the class;

(g) An order entering judgment in favor of plaintiff and the class against the defendants;

(h) Such other and further relief as the Court may deem appropriate.

Respectfully submitted,

THE CHERNER FIRM
By: Dan Cherner (DC-1905)
411 Theodore Fremd Ave. Suite 206S
Rye, NY 10580
(917) 310-9800
fedctsdc@gmail.com

Dated: April 1, 2021
Rye, New York